# FOR PUBLICATION

**FILED & ENTERED**

**FEB 14 2018**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY bolte          DEPUTY CLERK**

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No.: 8:15-bk-13556-MW |
| John Olaf Halvorson | Chapter: 7 |
| Debtor(s). | |
| Richard Baek, Baek 153, LLC, Pacific Commercial Group, LLC, | Adv. No: 8:15-ap-01391 |
| | Adv. No: 8:15-ap-01454 |
| Plaintiff(s), | |
| v. | **MEMORANDUM DECISION AND ORDER AFTER BIFURCATED TRIAL ON UNCLEAN HANDS** |
| John O. Halvorson, Dan L. Halvorson, Jerry Ann Randall, Jerry Ann Randall as trustee of the Jerry Ann Randall Trust dated July 30, 2007, PCC Fund 1, LLC, Granite Bay Partners II, LLC, JH Re Holdings, LLC, Commercial Income Advisors, Inc. | Dates:     October 30, 2017— November 3, 2017 |
| | Time:     9:00 a.m. |
| | Place:     411 West Fourth Street Courtroom 6C Santa Ana, CA 92701 |
| Defendant(s). | |
| Grace Baek | |
| Plaintiff(s), | |
| v. | |
| John Olaf Halvorson, Weneta M. Kosmala | |
| Defendant(s). | |

Steven J. Katzman and Ali Matin of Bienert, Miller & Katzman, PLC and Kyle Kveton of Robie & Matthai for Richard Baek, Baek 153, LLC, Pacific Commercial Group, LLC and Grace Baek

Jeffrey I. Golden and Reem J. Bello of Lobel Weiland Golden Friedman LLP for Weneta M. Kosmala, Chapter 7 Trustee

Marc C. Forsythe and Charity J. Miller of Goe & Forsythe LLP and Karen A. Rhyne of Michel & Rhyne for John O. Halvorson

Guillermo Cabrera of The Cabrera Firm, APC and Peter W. Bowie and Christopher Celentino of Dinsmore & Shohl LLP for Dan L. Halvorson and Jerry Ann Randall

Jessica R. MacGregor of Long & Levit LLP for Corey Tolliver and Christopher Coyle


**WALLACE, J.**

After learning facts suggesting the possibility that parties to a mediation ordered by this Court – a mediation conducted in a federal courthouse before federal judge Meredith A. Jury[1] – had intentionally sabotaged the mediation by arranging for the arrest <u>during the mediation</u> of another party to the mediation, namely, the debtor in this case, John O. Halvorson ("Mr. Halvorson"), the Court *sua sponte* ordered a bifurcated trial, the first phase of which was limited solely to the issue of whether such sabotage had actually occurred and, if it did, whether the equitable doctrine of unclean hands[2] would bar the guilty parties from obtaining any relief.  The bifurcated trial on unclean hands was conducted over a five-day period from October 30, 2017 through November 3, 2017.  For the reasons set forth below,

---

[1]  Meredith A. Jury is a United States Bankruptcy Judge for the Central District of California and was the Chief Judge of the Bankruptcy Appellate Panel of the Ninth Circuit during 2016-2017.

[2]  *See Keystone Driller Co v. General Excavator Co.,* 290 U.S. 240, 244-45, 54 S. Ct. 146, 78 L.Ed. 293 (1933): "It is one of the fundamental principles upon which equity jurisprudence is founded, that before a complainant can have a standing in court he must first show not only that he has a good and meritorious cause of action, but he must come into court with clean hands . . . The governing principle is 'that whenever a party who, as *actor*, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right or to award him any remedy' . . . 'A court of equity acts only when and as conscience commands, and if the conduct of the plaintiff be offensive to the dictates of natural justice, then, whatever may be the rights he possesses and whatever use he may make of them in a court of law, he will be held remediless in a court of equity.'" [italics in original].

1  the Court concludes that equity's unclean hands doctrine squarely applies and requires this

2  Court to shut its doors against the guilty parties, and to refuse to interfere on their behalf, to

3  acknowledge their right or to award them any remedy in these adversary proceedings.

4  **JURISDICTION AND VENUE**

5  This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 157,

6  1334.  Venue is proper under 28 U.S.C. § 1408.  This is a core matter under 28 U.S.C. §

7  157(b)(2)(A), (H), (I).  The parties have consented under the rule of *Stern v. Marshall* , 564

8  U.S. 462, 131 S. Ct. 2594 (2011) and *Wellness Int'l Network, Ltd. v. Sharif*, ___ U.S. ___, 135

9  S. Ct. 1932 (2015) to this Court's final determination of these adversary proceedings.[3]

10  **FINDINGS OF FACT**

11  A. *Events Leading Up to This Case's Commencement On July 16, 2015.*

12  Mr. Halvorson and Grace Baek ("Ms. Baek") were married on August 7, 2005.  Mr.

13  Halvorson was a real estate broker.  Ms. Baek had been a worldwide distribution director for

14  General Dynamics and had retired in 2003.[4]  Although the details remain somewhat sparse,

15  Mr. Halvorson became involved in business dealings in 2005 with Ms. Baek's brother, Richard

16  Baek ("Mr. Baek"), a high tech entrepreneur who, at the time of trial, was employing 500

17  persons through his various companies.[5]  They were business partners in a company named

18  Pacific Commercial Group, LLC, which Mr. Baek and Mr. Halvorson founded in 2007.  Mr.

19  Baek and Ms. Baek were members of Baek 153, LLC, a plaintiff herein and the owner of a

20  building leased in its entirety to one of Mr. Baek's companies, VTM.[6]

21  These business dealings eventually became contentious.  Additionally, the marriage

22  between Mr. Halvorson and Ms. Baek began to founder.  The couple separated on August 1,

23  2012, and Mr. Halvorson filed for divorce on November 30, 2012 in California state court.

24

25  _____

[3]  Joint Status Report, filed June 15, 2016 as Docket No. 64 in 8:15-ap-01391 and Docket No. 44 in 8:15-ap-01454-MW.

26  [4]  4 Reporter's Transcript ("R.T.") at page 105 of 217, lines 2 – 6.  The prefix "4" refers to the transcript for the

27  fourth day of trial on November 2, 2017.
[5]  3 R.T. at 99 of 268, lines 8 – 9, 114 of 268, lines 8 – 9.

28  [6]  3 R.T. at 101 of 268, lines 22 -25, 102 of 268, lines 1 – 3.

1  Litigation in Oregon state court commenced in early 2013[7] between Mr. Halvorson on one

2  side and Mr. Baek, Ms. Baek and their companies on the other side.

3       Specifically, Mr. Halvorson filed a case in the Circuit Court of the State of Oregon for

4  Washington County (later transferred to Multnomah County, Oregon), claiming that he was

5  owed a commission on the "Beaverton property" sale and seeking a declaratory judgment

6  establishing his ownership interest in Baek family investment companies.  The Baeks

7  commenced three cases against Mr. Halvorson.  In one of these actions, the Baeks alleged

8  that Mr. Halvorson interfered with the sale of the Beaverton property.  In the other two actions,

9  they alleged that he diverted company funds to his own use in 2007 and 2008.  Mr. Halvorson

10  filed counterclaims in these actions.[8]  Thus, as of the end of 2013 and including the divorce

11  action in California, there were no fewer than five lawsuits between Mr. Halvorson and the

12  Baeks.

13       The litigation between the parties appears to have been expensive and intense.  The

14  Baeks and their affiliates were later awarded about $750,000 in attorneys' fees between the

15  commencement of the litigation in early 2013 and its culmination in a General Judgment of

16  Contempt in early 2015.[9]

17       It was during the course of this litigation that Mr. Halvorson forged Ms. Baek's

18  signature and another individual's signature on a purported amended prenuptial agreement

19  and testified to its purported authenticity at his deposition.  The forgery, accomplished through

20  some sort of electronic cutting and pasting from a quitclaim deed that Ms. Baek had

21  previously signed,[10] was quickly discovered by the Baeks' attorney, Corey Tolliver, Esq. ("Mr.

22  Tolliver").  Mr. Halvorson attempted to make everything right through an errata sheet to the

23  deposition, but by then it was too late.  The Oregon court found Mr. Halvorson in contempt of

24  court and imposed harsh but just sanctions.  In February 2015 the court dismissed all the

25  
---

26  [7]  3 R.T. at 103 of 268, line 10.

[8]  Exhibit 100, Opinion and Order of the Circuit Court of the State of Oregon for the County of Multnomah, dated

27  June 25, 2014.

[9]  Exhibit 100, General Judgment of Contempt.

28  [10]  *See* footnote 19, *infra*.

claims and counterclaims brought by Mr. Halvorson, dismissed his defenses of claims brought against him in one of the three cases and awarded attorneys' fees to the Baeks and their affiliates of about $750,000.  The total amount of the Oregon state court judgment in favor of the Baeks and their affiliates against Mr. Halvorson was $785,972.75 (the "Oregon Judgment").[11]

Although the litigation in the Oregon state court against Mr. Halvorson appears to have been on multiple fronts and time- and energy-consuming as noted above, it nevertheless represented only one component of the Baeks' actions and strategy against him.  The other two components were actions in the criminal and administrative spheres:  Mr. Baek filed a police report against Mr. Halvorson in 2013 alleging embezzlement and a second police report in 2014 following the discovery of the forgery,[12] and the Baeks moved against Mr. Halvorson by asking administrative agencies to revoke his real estate licenses in both California and Oregon.[13]

At one point during these controversies the Baeks made a settlement offer which they described as a "final show of mercy" to Mr. Halvorson.  The offer, made by letter dated June 25, 2014, required Mr. Halvorson to sell his own house and pay all the net proceeds to the Baeks, to sell his aged and infirm mother's house in Stockton, California in which she had been living for 40 years[14] and pay all the net proceeds to the Baeks (unless he was able to get Ms. Baek off a loan on the house), to stipulate to the entry of a non-dischargeable $600,000 judgment, to agree to pay Ms. Baek  $4,000 per month for 5 years under a stipulated judgment in the divorce case,  and to give up the vehicle he had been driving, pay

---

[11]  Exhibit 100, General Judgment of Contempt.

[12]  3 R.T. at 103 of 268, lines 3 – 15.  Nothing came of the first complaint, with the police evidently declining to take action on it ("nothing was done about that").  3 R.T. at 104 of 268, lines 7 – 8.  The second police report was made on or about April 14, 2014, but after receiving the report the police did not contact Mr. Tolliver again until January 2016.  2 R.T. at 88-91 of 265.

[13]  The Baeks later added another component to their campaign against Mr. Halvorson:  filing a civil complaint in United States District Court against Mr. Halvorson's brother (Dan Halvorson) and his aged and infirm mother (Jerry Ann Randall).

[14]  As discussed below, Mr. Halvorson's mother was on title to this property as a joint tenant with Mr. Halvorson, and regarded herself as the property's owner.

for its detailing at a shop selected by Mr. Baek and deliver it from California to Portland, Oregon.[15]

Mr. Halvorson was given about 24 hours to accept this "final show of mercy." He chose to reject it.[16]

The Baeks moved swiftly against Mr. Halvorson following the entry of the Oregon Judgment in February 2015. An Application for Entry of Judgment on Sister-State Judgment was filed on February 25, 2015 in Superior Court of California, County of Orange ("Orange County Superior Court") seeking domestication of the Oregon Judgment in California (the place of Mr. Halvorson's residence).[17] Enforcement of the domesticated judgment was **temporarily** stayed pursuant to California Code of Civil Procedure section 1745(a). On or about April 2, 2015, Mr. Halvorson and his affiliates filed an ex parte application in Orange County Superior Court to further extend the stay of the domesticated judgment's enforcement under California Code of Civil Procedure section 1710.50(a)(1) on the ground that the Oregon Judgment was on appeal.[18]

Mr. Halvorson and his 78 year old mother, Jerry Ann Randall (individually and in her capacity as trustee of the Jerry Ann Randall Trust dated July 30, 2007, "Ms. Randall"), were on title as joint tenants to real property located at 4621 East Hildreth Lane, Stockton, California 95212 (the "Stockton Property").[19] Ms. Randall had been residing at the Stockton Property for about 40 years, and she regarded herself as its true owner, with Mr. Halvorson on title in order to facilitate the obtaining of a loan.[20] She was in declining health. Mr. Halvorson's brother, Dan Halvorson ("Dan"), had made loans over a period of time to Ms. Randall and also to Mr. Halvorson. As of 2015 he had loaned his mother about $75,000 to

---

[15] Exhibit 80. *See also* 2 R.T. at 92-94 of 265 ("The Court is going to overrule the objection. I think that comes in"); 2 R.T. at 97 of 265, lines 18-19.
[16] Exhibits 80 and 81.
[17] Exhibit 102.
[18] Exhibit 108.
[19] Previously, Ms. Baek had been on title to the Stockton Property, but subsequently quitclaimed her interest in it. It was her signature on the quitclaim deed that had been electronically lifted by Mr. Halvorson to perpetrate the forgery discussed above. 2 R.T. at 68-69 of 265, lines 23-25, 1-6.
[20] 3 R.T. at 212 of 268, lines 2 – 19.

$80,000.[21]  Dan's loans to Mr. Halvorson aggregated about $59,000.  On March 31, 2015, Mr. Halvorson and Ms. Randall signed a promissory note in the original principal amount of $125,000 with Dan as payee.[22]  This promissory note was secured by a deed of trust executed March 31, 2015 and recorded in the San Joaquin County Recorder's office on April 3, 2015.  At the time of the execution of these documents Dan was generally aware of the Oregon Judgment.[23]  Ms. Randall's knowledge of the Oregon Judgment at the time of the document's execution is uncertain, but at some point in time (whether contemporaneous with the documents' execution or months later) it appears she gained an understanding that the Baeks were trying to collect on the Oregon Judgment and something needed to be done to protect her interest in the Stockton Property,[24] and that this something involved the execution of the promissory note and deed of trust.

The Baeks evidently learned of the recordation of the deed of trust against the Stockton Property.  They responded by filing a complaint in the United States District Court for the Eastern District of California on July 2, 2015 against Mr. Halvorson, Ms. Randall and Dan (the "Eastern District Action").  The party plaintiffs in the Eastern District Action were Mr. Baek, Baek 153, LLC and Pacific Commercial Group, LLC.  This complaint was later amended on July 13, 2015[25] and stated causes of action under California law for intentional fraudulent transfer, constructive fraudulent transfer, common law fraudulent conveyance, conspiracy to commit fraudulent conveyance, aiding and abetting fraudulent conveyance, constructive trust and resulting trust.

Mr. Halvorson filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code on July 16, 2015, commencing this case.  Weneta M. Kosmala was appointed chapter 7 trustee (the "Trustee").

---

[21]  3 R. T. at 233 of 268, lines 21 – 25.
[22]  3 R.T. at 243 of 268, lines 10 – 21.
[23]  3 R.T. at 249 of 268, lines 11 – 20.
[24]  3 R.T. at 216-217 of 268, lines 17 – 25, 1 – 10.
[25]  The amended complaint added as defendants PCC Fund I, LLC, Granite Bay Partners II, LLC, JH RE Holdings, LLC and Commercial Income Advisors, Inc.  These were alleged to be entities that were alter egos of Mr. Halvorson.

B. *Events Leading Up to the Mediation on May 27, 2016.*

Early in the bankruptcy case, Ms. Baek filed a motion for relief from the automatic stay to permit the California divorce action to go forward.  Over opposition, the Court granted the motion in part and denied it in part by order entered August 27, 2015, permitting the divorce action to go forward in state court but denying the request for annulment.

On October 2, 2015, Ms. Baek, Mr. Baek and certain of their affiliates filed a complaint against Mr. Halvorson seeking a determination that Mr. Halvorson's liability to them under the Oregon Judgment is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2) (actual fraud, false representations, false pretenses) and 11 U.S.C. § 523(a)(6) (willful and malicious injury), thereby commencing Adversary Proceeding No. 8:15-ap-01382-MW (the "1382 Action").

The Trustee filed a Notice of Removal on October 14, 2015, removing the Eastern District Action to this Court, which was then re-designated as Adversary Proceeding No. 8:15-ap-01391-MW (the "1391 Action").  Because the causes of action in the 1391 Action involve administration of bankruptcy estate property, and proceedings to determine, avoid or recover fraudulent conveyances, the Trustee substituted in as real party in interest plaintiff as to all causes of action other than the seventh cause of action for conspiracy and the eighth cause of action for aiding and abetting.  The Baeks remain the real parties in interest plaintiffs as to the seventh and eighth causes of action.

Mr. Halvorson was granted a discharge on November 2, 2015.

On November 25, 2015, Ms. Baek filed a complaint against Mr. Halvorson and the Trustee, commencing Adversary Proceeding No. 8:15-ap-01454-MW (the "1454 Action").  The 1454 Action seeks a declaratory judgment as to what is and what is not property of the bankruptcy estate under 11 U.S.C. § 541.  *See* 11 U.S.C. § 541(a)(2) (all interests of the debtor's spouse in community property generally is property of the bankruptcy estate).  In the 1454 Action, Ms. Baek seeks a determination that certain property is Ms. Baek's separate property (and therefore not property of the bankruptcy estate), certain property is community property, and certain property is Mr. Halvorson's separate property (and therefore property of the bankruptcy estate).  Ms. Baek also seeks a determination in the 1454 Action that certain

indebtedness alleged to be owed to her by Mr. Halvorson is excepted from discharge under 11 U.S.C. § 523(a)(15) as a debt owed to a spouse or former spouse in the course of a divorce or separation.

The Court held a status conference in the 1391 Action and the 1454 Action on March 2, 2016 and issued an Order Continuing Status Conference and Sending Matter Into Mediation (the "Mediation Order") in each adversary proceeding.  Docket Nos. 39 (1391 Action) and 23 (1454 Action), filed and entered March 4, 2016.  Each of these orders provided that "[t]he Court  hereby sends this chapter 7 adversary proceeding into mediation and requires the parties to file a mediation stipulation and lodge an order thereon on or before March 31, 2016, with mediation to occur **May 1, 2016 or later**" [bold-face typing in the original].

The parties executed a mediation stipulation in each of the 1391 and 1454 Actions[26] (the "Mediation Stipulation") generally providing that all communications, oral or written, made during the mediation are confidential and, where appropriate, are to be considered work product and privileged.  In violation of the Mediation Order, no order was ever lodged by any party on either of the Mediation Stipulations, thereby depriving this Court of the opportunity to scrutinize the Mediation Stipulations' terms before approving them through an entered order. As will be seen, this proves to be a very serious issue because the Mediation Stipulation is overbroad in its terms by a wide margin and, if interpreted in the strict and literal fashion advocated by the Baeks, would lead to the conclusion that communications having absolutely nothing to do with the substance of the mediation would become confidential and could not be disclosed.  For example, if one of the participants in the mediation suddenly exclaimed, "I have pains running down my arm, I think I'm having a heart attack" and thereafter collapsed and became unconscious, this would be a confidential statement according to the Baeks'

---

[26]  Docket No. 52, filed April 1, 2016 (1391 Action); Docket No. 36, filed April 1, 2016 (1454 Action).  These Stipulations generally contain identical terms, the relevant differences being the captions in the two adversary proceedings and the parties signing the stipulation.

reasoning that could not be disclosed by the other participants to paramedics summoned to the mediation room following a 911 call without violating the Mediation Stipulation.

In the early part of 2016 the Baeks' efforts to get Mr. Halvorson criminally charged for the forgery began to bear fruit. Mr. Baek had developed a relationship with the police chief and other police officers in the Portland Police Department through an education-oriented charity.[27] The police came out to Mr. Baek's office to take his police report relating to Mr. Halvorson's forgery (even though Mr. Baek's office was not in the city of Portland).[28] Mr. Baek's attorney, Mr. Tolliver, was contacted by Portland law enforcement in January 2016 with respect to the second of the two police reports made by the Baeks.[29] From that point forward the criminal investigation of, and proceedings against, Mr. Halvorson began to gain momentum. The grand jury of Multnomah County (Oregon) was convened on May 9, 2016, and on May 10, 2016, after hearing testimony from Mr. Tolliver and Ms. Baek, indicted Mr. Halvorson for perjury, forgery, identity theft, attempted aggravated identity theft and attempted aggravated theft in the first degree.

These grand jury proceedings were covered by Deputy District Attorney Kevin Demer ("Mr. Demer"), who had been assigned to the case on May 9 after the previously-assigned attorney (Joel Peterson) went out on paternity leave. Mr. Peterson had led Mr. Tolliver to believe that arranging for Mr. Halvorson's arrest after return of the indictment would be easy because of a shuttle service that could transport Mr. Halvorson from southern California where he lived to Oregon. Mr. Demer, however, disabused Mr. Tolliver of the notion that Mr. Halvorson's arrest could be easily accomplished in a conversation they had on May 9, 2016. He seems to have told Mr. Tolliver that there were cost concerns about getting Mr. Halvorson extradited.[30] At this point Mr. Tolliver, after first making sure that Ms. Baek was in agreement, offered to Mr. Demer to pay for the cost of extraditing Mr. Halvorson from California to

---

[27] 3 R.T. at 105-107 of 268.
[28] 3 R.T. at 107 of 268, lines 18-24.
[29] 2 R.T. at 90-91 of 265.
[30] 2 R.T. at 136 of 265, lines 20-23.

Oregon.[31] There is no doubt that Mr. Tolliver and Ms. Baek wanted Mr. Halvorson arrested,[32] and that Mr. Demer knew they wanted him arrested.[33]

As it turned out, there were two obstacles standing in the way of arresting Mr. Halvorson.  One of these was the cost of extradition.  The second – ultimately proving to be no obstacle at all – was obtaining the right kind of arrest warrant.  For an arrest in California, Mr. Demer needed the warrant to be a National Crime Information Center ("NCIC") warrant.  Mr. Demer was under the impression prior to the date of the mediation that the warrant that had been issued was <u>not</u> an NCIC warrant.  However, he also testified that if a warrant was not NCIC, he could pick up the phone and on his own authority get it designated an NCIC warrant within about five minutes.[34]  As events later turned out, he discovered on the morning of the mediation that the warrant issued for Mr. Halvorson's arrest had been NCIC all along.[35]

Two weeks passed with seemingly little progress on "moving the case forward," as Mr. Demer described it, which meant getting Mr. Halvorson arrested.  Mr. Tolliver and Mr. Demer then had an important telephone conference on May 23, 2016 (four days before the mediation).  It was during this telephone conference that Mr. Tolliver and Mr. Demer again discussed getting Mr. Halvorson arrested.  Mr. Tolliver again told Mr. Demer that Ms. Baek wanted Mr. Halvorson arrested.  Although Mr. Tolliver testified that they did not discuss the Baeks' offer to pay for the cost of extradition during this telephone call, the Court does not believe Mr. Tolliver's testimony to be credible on this point and that in fact he and Mr. Demer did discuss this topic.

Significantly, it was during the May 23rd telephone conversation that Mr. Tolliver told Mr. Demer that Mr. Halvorson would be appearing on May 27, 2016 in U.S. Bankruptcy Judge Meredith A. Jury's chambers at the United States Courthouse in Riverside, California.[36]  Mr.

---

[31]  1 R.T. at 219 of 268, lines 1-9.  ("I didn't have time to have a conversation with her.  I think I looked over at her and said, would that something we could do?  And she nodded at me, that, yes, and then I made the offer to Mr. Demer.")
[32]  *See, e.g.,* 1 R.T. at 225 of 268, lines 16-24.
[33]  2 R.T. at 148 of 265, lines 16-21.
[34]  2 R.T. at 150 of 265, lines 16-25.
[35]  2 R.T. at 152-153 of 265.
[36]  1 R.T. at 227 of 268, lines 5-10.

1  Demer testified that if Mr. Tolliver had not informed him that Mr. Halvorson was going to be

2  present for the May 27th mediation, he probably would not have taken any steps to arrest him

3  that day.[37]

4      Following this telephone conference, Mr. Tolliver sent Mr. Demer an email at 5:30 pm

5  on May 23, 2016:  "Thanks for talking with me.  Please let me know if there is anything you

6  can do to help pick him up in California . . . Mr. Halvorson's SSN is [redacted] and his

7  California driver's license is [redacted] . . ."[38]

8      Five minutes after this email was sent, at 5:35 pm, Mr. Demer emailed his superior,

9  Brian Davidson, as follows:  "Case does not have NCIC charges . . . Tolliver is willing to pay

10  extradition cost.  They would even prepay it.  I told him we probably can't do that.  But maybe

11  we do. . . I did not tell him that we could mark warrant NCIC . . . but I don't do that without

12  support or a request from management . . . Tolliver knows where defendant is, because there

13  are court hearing occurring in California.  Victim wants him arrested."[39]

14      Two minutes later, at 5:37 pm, Mr. Demer emailed Mr. Tolliver "I am only able to do this

15  job because of justice and karma.  Let's touch bases toward the end of the week."

16      Brian Davidson's response the following day, May 24, to Mr. Demer's email to a certain

17  extent poured cold water on the idea of getting Mr. Halvorson arrested at the "court hearing

18  occurring in California":  "Not sure we're going to expand the reach of the warrant, but let's

19  discuss when you get back.  Pretty sure we're not going to take money from the victim for

20  extradition purposes."[40]

21      On the evening before the mediation, May 26 at 4:30 pm, Mr. Tolliver emailed Mr.

22  Demer: "Kevin, here's the information for tomorrow.  Mr. Halvorson was ordered to appear at

23  a proceeding at the bankruptcy court in Riverside, California.  He will be there tomorrow at

24  10:00 am, U.S. Bankruptcy Court, 3420 12th Street, Riverside, CA 92501. Courtroom 301,

25  Judge Jury.  I suspect Mr. Halvorson will be there for a good part of the day.  I'll give you a

26  
27  
28  

---

[37] 2 R.T. at 205 of 265, lines 7-12.
[38] Exhibit O.
[39] *Id.*
[40] Exhibit O, page 5.

call in a few minutes to see if you're able to get something in motion.  Thanks again.
Corey."[41]

Nineteen minutes after this email was transmitted, Mr. Tolliver sent Mr. Demer a
photograph of Mr. Halvorson by email.

On May 26 at 5:29 pm Mr. Demer sent Mr. Tolliver an email expressing doubt whether
he would be able to arrange for Mr. Halvorson's arrest:  "I am checking but that is really south,
close to L.A. and we don't go there.  I will confirm in the morning when that staff person
comes in.  Alternatively there is Plan B where we let him know that there is a warrant and
show him the courtesy of giving him the opportunity to turn himself in . . . You have a copy of
the indictment.  I would think that the admin judge or opposing counsel would want to know
about it, maybe?"[42]  At 8:45 pm Mr. Tolliver replied:  "If it's not possible to pick him up down
here, we understand. . . I know Grace appreciates everything you are doing in this case."[43]

What is especially significant about this email exchange is Mr. Demer's statement to
Mr. Tolliver that Mr. Tolliver has a copy of the indictment and his suggestion that perhaps "the
admin judge or opposing counsel would want to know about it, maybe?"  Mr. Tolliver did not
answer or reply to this suggestion and, although he had a copy of the indictment with him at
the mediation, he did not share it with Judge Jury until after Mr. Halvorson had been arrested.

C. *The May 27, 2016 Mediation Before U.S. Bankruptcy Judge Meredith A. Jury.*

The mediation on May 27 was held in Judge Meredith A. Jury's courtroom and
chambers at the United States Courthouse in Riverside, California.  It commenced at 10:00
am in Judge Jury's courtroom.  After addressing the parties who had assembled in the
courtroom, Judge Jury ushered the parties and their attorneys into three separate rooms.  In
one room were Mr. Baek, Ms. Baek, Mr. Baek's personal assistant and their attorneys, Mr.
Tolliver and Christopher Coyle, Esq.  Despite the fact that the 1454 Action involved issues of
community property law, Ms. Baek's family law attorney, Bret Hunter, Esq., was not present at

---

[41] Exhibit. X, page 252.
[42] Exhibit. X, page 251.
[43] Exhibit X, pages 250-251.

the mediation.  In another room were Mr. Halvorson, Dan, Charity Miller, Esq. and Karen Rhyne, Esq. (Mr. Halvorson's bankruptcy and family law attorneys) and Guillermo Cabrera, Esq. (attorney for Dan and Ms. Randall).  Ms. Randall had been excused from attending in view of her age and infirmity.  In a third room were the Trustee's attorneys, Jeffrey Golden, Esq. and Reem Bello, Esq.[44]  Judge Jury met separately with each group.  At some point Dan and Mr. Cabrera met separately with Judge Jury.

Prior to the mediation's commencement, Mr. Demer emailed Mr. Tolliver at 8:42 am: "Well, I just learned we don't do California.  Just Washington, Montana and Idaho.  But I have confirmed this morning with the Riverside police that they will go talk to him this morning for me, in the federal courthouse. . . I will ask they inform him of the warrant, to call me, and advise him to turn himself in Oregon."[45]  Mr. Tolliver replied by email at 9:06 am: "Here's the link to Judge Jury's calendar for today.  It's a mandatory settlement conference, mostly for claims with the trustee and lien issues, but the Court ordered Mr. Halvorson to be in attendance."[46]

Sometime after this email exchange and before approximately 11:00 am, Mr. Demer made the decision to have Mr. Halvorson arrested.  Mr. Demer testified the critical factor was his discovery that the arrest warrant had been NCIC all along.  On the face of things, this would seem to be undercut by his other testimony that he could get a warrant changed from non-NCIC to NCIC in five minutes with a simple telephone call.  However, the May 23 - May 24 email exchange between Brian Davidson and Mr. Demer quoted above suggests there were "management issues" involved in changing the scope of a warrant from non-NCIC to NCIC ("not sure we're going to expand the scope of the warrant").  It is possible that Mr. Demer's discovery that the warrant was NCIC all along eliminated this management issue and opened the way for Mr. Halvorson's arrest at the mediation.

---

[44] 3 R.T. at 219-222 of 268.
[45] Exhibit X at page 250.
[46] *Id.*

1.   *Communications During the Mediation.*

After making the decision to have Mr. Halvorson arrested, Mr. Demer appears to have contacted Lieutenant Dan Hoxmeier of the Riverside Police Department to help arrange or coordinate the arrest.[47]  He followed this up with an email to Lieutenant Hoxmeier at 11:07 am on May 27: "Lt. Hoxmeier, thank you for your assistance in hopefully getting this person arrested . . . I have attached our warrant.  I have also attached a picture of him.  I have confirmed the warrant is NCIC . . . He is supposed to be here:  U.S. Bankruptcy Court, 3420 12th Street, Riverside, CA 92501.  Courtroom 301, Judge Meredith Jury . . . Mr. Halvorson's SSN is [redacted] and his California driver's license is [redacted] . . ."[48]  Lieutenant Hoxmeier replied one minute later at 11:08 am:  "Got it.  Working on it now."[49]

Between 11:08 am and 11:45 am, Mr. Demer seems to have changed gears and made an effort to have the arrest of Mr. Halvorson effectuated by the United States Marshals Service as opposed to the Riverside Police Department.  He sent an email to Lieutenant Hoxmeier at 11:45 am:  "Sir, I may be able to get the marshalls [sic] to act on the warrant . . ."[50]

Three minutes later, at 11:48 am, Mr. Demer sent an email to Mr. Tolliver:  "I am on hold trying to get Marshalls [sic] to do it.  They have confirmed he is there."[51]

Mr. Demer apparently really wanted to make sure that Mr. Tolliver received this message, so he followed up with a mobile phone text message to Mr. Tolliver seven minutes later at 11:55 am:  "I am on hold trying to get the Marshalls [sic] to do it.  They have confirmed he is there."[52]  All other messages sent by Mr. Demer to Mr. Tolliver that are described above (or described below, for that matter) were sent only once, by email or text.  This message, however, was sent <u>twice</u>, once by email and once by text.  The Court believes it was a signal to Mr. Tolliver that the arrest was going to take place.  Mr. Demer testified otherwise, that it

---

[47] 2 R.T. at 228 of 265, lines 2-8.
[48] Exhibit N, page 13.
[49] *Id.*
[50] *Id.*
[51] Exhibit X, page 250.
[52] Exhibit N, page 1.

1  was an intentionally vague message,[53] but the Court does not regard his testimony as

2  credible.  Why bother sending an intentionally vague message twice?  The reason that

3  messages are sent more than once is typically because it is very important for the recipient

4  to receive the message.

5      Mr. Tolliver replied by text message at 11:57 am:  "Thank you.  He's here.  3rd floor

6  Conference room right next to courtroom 301. The conference room is room 346."[54]  This

7  communication was made by a party's attorney during the mediation.[55]

8      Four minutes later, Mr. Demer texted Mr. Tolliver at 12:01 pm:  "Marshalls [sic] working

9  on it but I am worried about lunch break for them and target.  Is target set to return after

10  lunch?"  Note the use of code-like terms:  "it", "target."  Messrs. Demer and Tolliver certainly

11  knew that "target" referred to Mr. Halvorson, and the Court believes they also understood that

12  "it" was a reference to Mr. Halvorson's arrest.

13      Mr. Tolliver replied at 12:05 pm:  "He's not leaving anytime soon, I do not think.  He's

14  waiting to talk to the judge.  But yes, if he left he would have to come back.  I just don't think

15  he's going to take off anytime soon."[56]  This communication was made by a party's attorney

16  during the mediation.

17      Mr. Halvorson was arrested by the United States Marshals Service at approximately

18  3:00 to 3:10 pm by Supervisory Deputy U.S. Marshal Joseph Lewis II with the assistance of

19  another Deputy U.S. Marshal.  The arrest was effectuated without incident, and Mr. Halvorson

20  was taken to the Marshals' cellblock for processing.[57]  At the end of the day Mr. Halvorson

21  was transported by the U.S. Marshals Service to the Riverside County Sheriff's Department.[58]

22

23

24  [53] 2 R.T. at 188-189 of 265.
   [54] Exhibit N, page 2.

25  [55] Because the Mediation Stipulation's confidentiality provisions extend only to communications made by a party
   or a party's attorney during the mediation, the Court here separately identifies communications admitted into

26  evidence that were made by a party or a party's attorney during the mediation, which began at 10:00 am on May
   27, 2016 and ended at approximately 3:00 – 3:10 pm that same day.

27  [56] Exhibit N, page 3.
   [57] 4 R.T. at 15-16 of 217.

28  [58] 4 R.T. at 17 of 217.

Judge Jury seems to have learned of the plan to arrest Mr. Halvorson only a very short while before it happened.[59] She was very upset and said to Mr. Tolliver, "I've never had this happen before.  This is a first for me.  The debtor has just been arrested."[60] Mr. Tolliver, who had brought a copy of the indictment with him to the mediation, handed the indictment copy to Judge Jury.[61] Judge Jury was, in Mr. Tolliver's words, "flabbergasted" and announced, "the mediation is over."[62] Thus, the mediation ended at about 3:00 to 3:10 pm without a settlement by or among any of the parties.

There then followed what the Court would describe as the "high five-ing" messages between Mr. Demer and Mr. Tolliver in which they exulted over Mr. Halvorson's arrest and especially the fact that he might well end up being incarcerated over the long Memorial Day weekend.  Mr. Demer texted Mr. Tolliver:  "I was informed he is in custody."  Mr. Tolliver replied at 3:37 pm:  "I was just told by the judge the same thing.  **We appreciate your work on this.  Grace says thanks, and that she is really greatful [sic] for the way you've approached the whole thing"**[63]  [bold-face type added by the Court].

Mr. Demer's reply at 4:00 pm:  "California may allow him to post bail.  **If not, next court date is TUESDAY!"** [bold-faced type added by the Court; all caps and exclamation point after "Tuesday" are in the original].[64]

The final communication on the day of the mediation between Mr. Tolliver and Mr. Demer appears to be an email sent at 4:39 pm by Mr. Demer to Mr. Tolliver:  **" . . . I will touch base on Tuesday.  It sounds like the therapeutic effect of seeing the handcuffs go on was not observed by you and your client.  Perhaps another time"** [bold-faced type added by the Court].[65]

---

[59]  Mr. Demer sent an email warning of the plan to arrest Mr. Halvorson to a member of Judge Jury's staff around noon, but the staff member appears not to have timely informed Judge Jury.
[60]  3 R.T. at 86 of 268, lines 4-11.
[61]  3 R.T. at 87 of 268, lines 5-6.
[62]  3 R.T. at 87 of 268, lines 14-15.
[63]  Exhibit N, page 5.
[64]  *Id.*
[65]  Exhibit X, page 249.

D. *Proceedings After the May 27, 2016 Mediation.*

As of the time of the mediation and its immediate aftermath, the Court was well aware that the Baeks had commenced three lawsuits against Mr. Halvorson in Oregon state court, had sued Mr. Halvorson, his mother and brother in the United States District Court for the Eastern District of California, had commenced two additional adversary proceedings against him in this Court and had generally litigated with an intensity not often seen.  Against this backdrop of no-holds-barred litigation, the Court had a difficult time believing that Mr. Halvorson's arrest during the mediation was a pure coincidence.

The Court held a status conference with respect to the 1391 and 1454 Actions on June 22, 2016.  It was at this status conference that the Court received confirmation from the parties that Mr. Halvorson had in fact been arrested while the mediation was in progress.  The Court then issued an Order After Status Conference raising the unclean hands doctrine *sua sponte* and staying the adversary proceedings except as to the issue of whether any party to the mediation was guilty of unclean hands by reason of taking actions that had the effect of sabotaging the mediation through Mr. Halvorson's arrest.  The Court indicated an intention to hold a bifurcated trial, the first phase of which would be limited solely to the issue of unclean hands.  The Court expressly permitted the parties to take discovery on these matters.

Discovery proved to be problematic.  In response to discovery requests by Mr. Halvorson, Mr. Tolliver (who at this point in the case was being separately represented by his own set of attorneys) objected that the requests were overbroad because there were more than 106,000 non-duplicative documents that were potentially responsive to the request. Getting out its calculator, the Court determined that if this were true, one responsive document would have been transmitted on average every 4 minutes and 40 seconds, 24 hours per day, 7 days per week, including Saturdays, Sundays and holidays with no time off for vacations for the entire eleven month period in question (January 1, 2016 through December 6, 2016).  The Court sanctioned Mr. Tolliver and his attorneys in the amount of $6,985.50 for discovery abuses.

The Baeks moved for partial summary judgment and also moved to dismiss the unclean hands affirmative defense on various grounds.  The Court heard these motions on May 31, 2017 and denied them on June 19, 2017, in some instances without prejudice to them being renewed at trial.  The Baeks then filed motions on July 11, 2017 seeking the permission of the United States District Court for the Central District of California (the "District Court") to take an interlocutory appeal of this Court's orders denying the motions.  The District Court denied these motions on July 25, 2017, declining to permit interlocutory appeals to go forward.

A bench trial was held in the Circuit Court of the State of Oregon, Multnomah County, on July 31, 2017-August 4, 2017 on the criminal charges against Mr. Halvorson stated in the May 10, 2016 indictment.  Mr. Halvorson was convicted of forgery and two counts of identity theft, and acquitted of perjury.  The count for attempted aggravated theft in the first degree was dismissed.[66]

On August 21, 2017 the Court entered an Order Setting Case For Trial, setting the first phase of the bifurcated trial for October 30, 2017 to November 3, 2017.[67]

In a transparent effort to avoid a trial on unclean hands, the Baeks entered into and executed a settlement agreement with the Trustee (subject to Court approval) on or about October 6, 2017 providing for the Baeks' purchase and acquisition of the Trustee's rights, claims and interests in the 1454 Action and the execution and filing of a stipulated judgment in the 1391 Action.  A motion for entry of an order approving this settlement agreement was filed on October 6, 2017.  Numbered paragraph 9 of the settlement agreement required the Trustee to seek and obtain a continuance of the unclean hands trial.  Pursuant to this provision, the Trustee filed a motion to continue the bifurcated trial on unclean hands until after the motion to approve the settlement was heard and determined.

---

[66] Exhibit 209.

[67] Docket No. 177 in the 1391 Action and Docket No. 259 in the 1454 Action, filed and entered August 21, 2017. The pretrial conferences were held on June 21, 2017, but the Court deferred issuing the Order Setting Case For Trial pending action by the District Court on the Baeks' motions to take an interlocutory appeal of the orders denying the motion for summary judgment and motion to dismiss.

A noteworthy provision of the proposed settlement agreement is section 5(d), which provides for the Baeks' purchase of Mr. Halvorson's causes of action for malpractice against nine of his attorneys plus five law firms who had represented him, namely, Jonathan Radmacher, McEwen Gisvold, Chris Barsness, David F. Calderon, Lisa Hughes, Bruce Hughes, Karen Rhyne, Saul Gelbart, Lisa Maxfield, Barth Calderon, L.P., Hughes & Hughes, LLP, Michel & Rhyne, Stegmeier, Gelbart, Schwartz, Benavente and Pacific Northwest Law, LLP. Mr. Halvorson did not schedule any malpractice causes of action against his attorneys, and the Court is unaware of any such causes of action being asserted by either Mr. Halvorson or the Trustee. One wonders whether this provision was intended to prevent Mr. Halvorson from reaping any benefit by suing his attorneys (even though there is no indication he had any intention to do so) or to lay the groundwork for the Baeks to file malpractice actions against Mr. Halvorson's attorneys to punish them for having the temerity to represent Mr. Halvorson against them.

The Court determined that the execution of the settlement agreement violated this Court's stay of all proceedings in the 1391 Action and 1454 Action until after the unclean hands trial had been held and completed. Accordingly, the Court denied the motion for a continuance of the trial.

Trial of this case commenced on Monday, October 30, 2017 and ran through Friday, November 3, 2017. Twenty-five minutes after trial commenced, at 9:25 a.m. on October 30, 2017, the Baeks filed an Emergency Motion to Recuse Bankruptcy Judge Mark Wallace Under 28 U.S.C. § 455 (the "Recusal Motion") in this Court. On November 17, 2017, the Baeks filed a Motion to Withdraw the Reference in the 1391 Action and 1454 Action (the "Reference  Withdrawal Motion") in the District Court.

The Recusal Motion was heard by the Honorable Theodor C. Albert, United States Bankruptcy Judge, on January 9, 2018 and denied by order entered January 23, 2018. The Reference Withdrawal Motion was denied by the Honorable James V. Selna, United States District Judge, on January 29, 2018.

The Baeks filed a notice of appeal to the District Court on the denial of the Recusal Motion. Additionally, they filed in this Court an emergency motion for a stay of the effectiveness of the order denying the recusal motion (the "Stay Motion") and a motion for certification of a direct appeal (the "Certification Motion") to the United States Court of Appeals for the Ninth Circuit (the "Ninth Circuit") — with each motion being assigned to Judge Albert. In the Stay Motion, the Baeks warned Judge Albert that if he failed to grant their motion to certify a direct appeal to the Ninth Circuit, they would apply to the Ninth Circuit for a writ of mandamus compelling him to certify issues pertaining to the Recusal Motion for direct appeal.[68]

The Baeks' threat to seek mandamus relief against Judge Albert should he deny the Certification Motion was unavailing. Judge Albert denied the Certification Motion on February 9, 2018. The Stay Motion had been denied about two weeks earlier, on January 25, 2018.

The Baeks filed a Petition for Writ of Mandamus with the Ninth Circuit on February 2, 2018.

## CONCLUSIONS OF LAW

*A. The Burden of Proof.*

The burden of proof in this matter is on the parties advocating for application of the defense of unclean hands against the Baeks: the Trustee, Mr. Halvorson, Dan and Ms. Randall. The burden of proof applicable here is proof by clear and convincing evidence. *Astra Aktiebolag v. Andrx Pharms., Inc. (In re Omeprazole Patent Litig).,* 483 F.3d 1364, 1374 (Fed. Cir. 2007); *Aptix Corp. v. Quickturn Design Sys.,* 269 F.3d 1369, 1374 (Fed. Cir. 2001); *Gilead Scis., Inc. v. Merck & Co., Inc.*, No. 13-cv-04057-BLF, 2016 U.S. Dist. LEXIS 73595, 2016 WL 3143943 (N.D. Cal. June 6, 2016).

---

[68]   Emergency Motion for Stay of Effectiveness of Order Denying Recusal Motion, Docket No. 248 in 8:15-bk-13556-MW, filed January 23, 2018 at page 2 of 9, footnote 3, lines 25-26:  "If this Court denies the Certification Motion, the Baek parties intend to seek relief in mandamus from the Ninth Circuit."

*B. The Baeks' Motions in Limine.*

The Baeks filed motions in limine raising a number of issues that had been previously raised in a motion for partial summary judgment and a motion to dismiss.  The Court now discusses and summarizes its reasons for denying these motions in limine.

　　1. *The Mediation Stipulation and Federal and California Rules of Evidence on Mediation Confidentiality.*

As discussed above, the parties entered into a Mediation Stipulation addressing confidentiality and privilege rules with respect to mediation matters.  As a general rule, mediation stipulations are enforceable as between the parties in accordance with their terms. *Facebook, Inc. v. Pacific Northwest Software, Inc.*, 640 F.3d 1034 (9th Cir. 2011).  The Baeks argue in their motion in limine that the Mediation Stipulation renders inadmissible evidence "regarding what was communicated and occurred at the mediation,"[69] and thereby seek to exclude communications between Mr. Tolliver and Mr. Demer as described above.  This argument fails for three separate, independent reasons.

First, although the Mediation Order expressly required the parties to lodge an order approving the Mediation Stipulation, no order was ever lodged.  Because no order was ever lodged, no order was ever entered approving the Mediation Stipulation.  Under Local Bankruptcy Rule 9071-1(a)(2), the Mediation Stipulation never became effective because no separate order thereon was ever entered.  *Cf. In re Tri-State Ethanol Co., LLC,* No. 03-10194, 2009 Bankr. LEXIS 2017, 2009 WL 1079776 (Bankr. D.S.D. April 21, 2009).

The Court does not necessarily and in all cases review each and every pleading filed in every case.  When parties seek approval of a stipulation, the general practice is to file the stipulation and lodge an order thereon.  In the absence of a lodged order, the Court might very well not notice in a timely fashion that a stipulation has been filed.  This is what occurred here.  The failure to lodge an order approving the Mediation Stipulation deprived the Court of the opportunity to review the Mediation Stipulation, strike objectionable (to the Court)

---

[69] Plaintiffs' Motions in Limine, Docket No. 196 in the 1391 Action, filed September 25, 2017 at page 19 of 28, line 16.

provisions thereof and possibly order the parties to re-negotiate the Mediation Stipulation in order to clarify its many vague and ambiguous provisions.

As it turned out, and as discussed below, the Mediation Stipulation is a deeply flawed document that the Court never would have approved if it had the opportunity to review it in a timely fashion.  For instance, the Mediation Stipulation provides "[t]he mediation process shall be considered a settlement negotiation for the purpose of all federal and state rules protecting disclosures made during such conferences from later discovery or use in evidence."[70]  The Baeks have argued that this provision requires this Court to apply <u>California rules of evidence</u> in ruling on objections to the admission of evidence in these adversary proceedings where the Mediation Stipulation is at issue.  Such an interpretation would require this Court to violate Federal Rule of Bankruptcy Procedure 9017, which requires the Court to apply the Federal Rules of Evidence, not state rules of evidence, in proceedings before it.  This provision alone would have led the Court to disapprove the Mediation Stipulation.

Additionally, certain interpretations of the Mediation Stipulation can lead to absurd conclusions, such as the conclusion that an email or text message sent during the mediation by one of the mediation parties to a hired assassin coordinating the murder of another mediation party's wife and children would be privileged in a subsequent civil wrongful death action brought against the guilty mediation party.  Or, to employ another hypothetical, if a participant in the mediation suddenly experienced chest pains, exclaimed "I think I'm having a heart attack," and thereafter collapsed, is the Court to understand that this statement could not be disclosed to paramedics summoned to the mediation because it is made confidential by the Mediation Stipulation?  Because the Court was deprived of the opportunity to review the Mediation Stipulation and rein in its overreaching provisions, and because no order was lodged thereon, the Mediation Stipulation is unenforceable to the extent it purports to apply to statements and communications made during the mediation by a party to the mediation where such statements were totally unrelated to the fundamental mediation purpose.  This includes

---

[70]  Mediation Stipulation at numbered paragraph 5.

the communications from Mr. Tolliver to Mr. Demer referenced above (because these communications had nothing to do with the fundamental purposes of the mediation) as well as communications in the hypothetical examples discussed above (a participant having a heart attack and a participant coordinating an assassination).

Second, even if the Mediation Stipulation is enforceable, it does not have the broad evidence-excluding effect advocated by the Baeks.  Numbered paragraph 5 of the Mediation Stipulation provides in relevant part:

> 5.  The mediation process shall be considered a settlement negotiation for the purpose of all federal and state rules protecting disclosures made <u>during such conferences</u> from later discovery or use in evidence . . .  All communications, oral, or written, <u>made during the Mediation</u> *by any party or a party's agent, employee, or attorney* are confidential and, where appropriate, are to be considered work product and privileged.  Such communications, statement, promises, offers, views and opinions shall not be subject to any discovery or admissible for any purpose, including impeachment, in any litigation or other proceeding involving the parties.  Provided, however, that evidence otherwise subject to discovery or admissible is not excluded from discovery or admission into evidence simply as a result of it having been used in connection with the mediation process.

[underscoring and italics added by the Court].

As shown earlier, the mediation commenced at 10:00 am in Judge Jury's courtroom and ended between 3:00 pm and 3:10 pm following Mr. Halvorson's arrest and as announced by Judge Jury.[71]  During this time period, and as reviewed above, there were various communications by Mr. Demer to Mr. Tolliver and law enforcement.  These communications are not within the scope of the Mediation Stipulation because they were not made by a party, party's agent, employee or attorney – Mr. Demer not falling into any of those categories.  During the mediation time period, only two communications were made by Mr. Tolliver to Mr. Demer:  text messages at 11:57 am and 12:05 pm.  These messages were revealed through discovery propounded upon Mr. Demer by Mr. Halvorson, and therefore would appear to fall within the proviso (evidence otherwise subject to discovery).  Even if they do not fall within the

---

[71] *See* text accompanying footnote 62 ("the mediation is over").

proviso, the evidence against the Baeks on unclean hands is otherwise so clear and convincing that the exclusion of these two text messages would not change the ultimate determination of this case.

The first sentence of numbered paragraph 5 of the Mediation Stipulation brings into play "federal and state rules protecting disclosures" but by its express terms is limited to "disclosures made during such conferences."[72]  These "disclosures" are the same as those described in the preceding paragraph.  The relevant Federal Rule of Evidence is Rule 408.  Rule 408 renders inadmissible" . . .conduct or a statement  made during compromise negotiations <u>about the claim</u>. . . ."  [underscoring added by the Court].  Mr. Demer's email and text messages to law enforcement and Mr. Tolliver had nothing to do with the claims being mediated; they had to do with Mr. Halvorson's arrest.  The same applies to Mr. Tolliver's text messages to Mr. Demer at 11:57 am and 12:05 pm on the day of the mediation.  Clearly, this evidence is not excluded by Federal Rule of Evidence 408.

State rules relating to mediation confidentiality are set forth in California Evidence Code §§ 1115-1128.  The Court interprets the reference in numbered paragraph 5 of the Mediation Stipulation to "state rules protecting disclosures made during such conferences" as a reference to these sections of California's Evidence Code.  Once again, however, the Mediation Stipulation renders these rules applicable only to "disclosures made during such conferences."  More important, the Court interprets the Mediation Stipulation as providing that federal rules will apply to federal proceedings, and state rules will apply to state proceedings.  The Court is unaware of any means or method whereby litigants can properly require this Court to apply state rules of evidence in federal bankruptcy cases and adversary proceedings arising in such cases.[73]  Indeed, the application of such California evidence rules would

---

[72]  The Court interprets the word "conferences" to be a reference to a mediation conference.  The use of the word "such" preceding "conferences" implies a reference back to "settlement negotiation," which is  the mediation conference.

[73]  Any application of both federal and California evidence rules with respect to the matter here in issue would be highly problematic because the rules are arguably in conflict:  Federal Rule of Evidence 408 would permit the introduction of the Demer-Tolliver communications during the mediation, whereas California Evidence Code § 1119(b) could preclude it (subject, however, to California Evidence Code § 1120, relating to evidence otherwise admissible or subject to discovery outside of a mediation).

violate Federal Rule of Bankruptcy Procedure 9017, which provides "[t]he Federal Rules of Evidence . . . apply in cases under the Code." *Boone v. Barnes (In re Barnes)*, 266 B.R. 397 (B.A.P. 8th Cir. 2001).[74]

Third, the Court determined after a Federal Rule of Evidence 104 hearing that the parties never intended the Mediation Stipulation to apply to conduct occurring during a mediation (namely, communications made for the purpose of arranging for or otherwise facilitating Mr. Halvorson's arrest), having nothing to do with the purpose for which the mediation was being held.  The Mediation Stipulation was intended to apply to bona fide discussions and negotiations relating to settlement of the 1391 Action and the 1454 Action, not to conduct and statements and writings totally unrelated to the fundamental mediation purpose.

### 2.  *California Litigation Privilege.*

California Civil Code section 47, entitled "Privileged Publications or Broadcasts – Exceptions," is positioned in the Civil Code amidst sections dealing with Defamation (Civil Code § 44), Libel (Civil Code § 45), Slander (Civil Code § 46), Defamation Action by Peace Officer (Civil Code § 47.5) and Defamation by Radio (Civil Code § 48.5).  It provides in relevant part that "[a] privileged publication or broadcast is one made:  (b) In any . . . (2) judicial proceeding, (3) in any other official proceeding authorized by law . . ."  The Baeks argue that the California litigation privilege conferred by Civil Code section 47(b) "is a substantive right of absolute immunity, not an evidentiary privilege."  Consolidated Reply Re: Motion for Partial Summary Judgment, Docket No. 138 in the 1391 Action and Docket No. 211 in the 1454 Action, filed May 17, 2017 (the "Reply") at page 12 of 27, lines 11-12.  The Court agrees with this statement.

---

[74]  Although Federal Rule of Evidence 501 makes applicable state law governing "privilege regarding a claim or defense for which state law supplies the rule of decision," California Evidence Code §§ 1115-1128 do not set forth privileges under California law.  Privileges under California law are set forth in Division 8 of the California Evidence Code (entitled "Privileges"), whereas sections 1115-1128 appear in Division 9, entitled "Evidence Affected or Excluded by Extrinsic Policies."

Although one might guess from a reading of section 47(b) and a consideration of its position in the Civil Code amidst a number of statutes dealing with various forms of defamation that it provides immunity only against defamation causes of action, it is clear that the California courts have interpreted it far more expansively to many tort causes of action beyond defamation, including causes of action for race-based discrimination, false imprisonment, emotional distress and others. *Hagberg v. California Federal Bank*, 32 Cal. 4th 350 (2004). It may even be the case that the absolute immunity created under section 47(b) extends to non-tort causes of action.

The principal purpose of the litigation privilege is to afford litigants and witnesses the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions. *Action Apartment Ass'n, Inc. v. City of Santa Monica*, 41 Cal. 4th 1232, 1241(2007). The doctrine is not without its limits, however. The California Supreme Court has determined that litigation privilege does not extend to actions for malicious prosecution. *Albertson v. Raboff*, 46 Cal. 2d 375, 382 (1956). Commentators have stated that for litigation privilege to attach, a court must find that the statement or conduct was not used for a purpose for which the litigation was not designed. "Otherwise, the privilege 'would effectively convert what is meant to be a shield of immunity into a sword.'" The Litigation Privilege: Its Place in Contemporary Jurisprudence, Louise Lark Hill, 44 Hofstra L. Rev. 401, 408 (2015). This comment underscores the point that an immunity is, <u>by its very definition</u>, a shield against being sued, not a sword by which otherwise proper defenses can be rendered useless.

The Baeks' argument that section 47(b) sets up an absolute immunity for communications by them or on their behalf to law enforcement authorities and therefore compels the Court to grant judgment in their favor on the unclean hands affirmative defense fails for a number of reasons. First and foremost, section 47(b) is a shield, not a sword. It provides absolute immunity against causes of action arising out of communications to law enforcement authorities, <u>but what is before the Court is not a cause of action, it is an affirmative defense</u>. The matter tried here involves not some cause of action by Mr. Halvorson and the Trustee against the Baeks but rather an affirmative defense of unclean

hands against them with respect to <u>their</u> causes of action against <u>Defendants</u>.  The Baeks have cited the Court to no authority holding that section 47(b) can be used as a sword to pierce an affirmative defense, and the Court has found no such authority.

Second, even if section 47(b) is hypothetically assumed to be applicable to garden-variety affirmative defenses, it is far from clear that it would have any validity as against an equitable defense of unclean hands.  As the Supreme Court of the United States pointed out in *Keystone Driller Co. v. General Excavator Co., supra,* <u>no matter what rights a person may have and what use he or she may make of them in a court of law</u>, such person, if determined to be guilty of unclean hands, "will be held remediless in a court of equity."  [underscoring added by the Court].  Here as well the Baeks have cited the Court to no authority (and the Court has found no authority) that California litigation privilege can override an unclean hands defense based on California or federal law.  It is sometimes stated that unclean hands is "not actually a defense, but a concept designed to protect the court from becoming a party to the transgressor's misconduct."  *In re Napster, Inc. Copyright Litig.*, 191 F. Supp. 2d 1087, 1111 (N.D. Cal. 2002).  If it is unlikely that the immunity of litigation privilege can pierce an affirmative defense, it is even more unlikely that the litigation privilege doctrine prevents a court of equity from applying the unclean hands doctrine to protect itself from becoming a party to a transgressor's misconduct.  Given the fact that the unclean hands doctrine was developed by courts of equity to protect the court itself (as distinguished from the litigants before it), it is unlikely that an equity rule designed to protect the court from becoming the aider and abettor of litigants' bad conduct would give way to an immunity for those very litigants.

Third, with respect to the 1454 Action, although the California litigation privilege can bar pendent state law claims in an action in a United States District Court where jurisdiction is founded on diversity of citizenship, it is uncontroversial that the litigation privilege does not apply to <u>federal claims</u>.  *Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*, 790 F. Supp. 2d 1024, 1030 (N.D. Cal. 2011).  The claims in the 1454 Action are entirely federal in nature: they relate to the Court's determination of what is and what is not property of the bankruptcy

estate under 11 U.S.C. § 541 (Mr. Halvorson's separate property and community property is property of the bankruptcy estate pursuant to 11 U.S.C. § 541(a)(2)) and whether Ms. Baek's claims against Mr. Halvorson are excepted from discharge under 11 U.S.C. § 523(a)(15).

### 3. *The Unclean Hands Doctrine's Direct Relationship Requirement.*

It is a black-letter rule of equity that the misconduct alleged to form the basis for application of the unclean hands doctrine must be directly related to the matter in litigation and cannot be unconnected with the matter in litigation.[75]  The Baeks argue in their motion in limine that the direct relationship test or requirement is not met in this case.

The Court's view is that the direct relationship requirement is satisfied here because the alleged misconduct – sabotage of a mediation ordered by the Court – occurred during the very course of the litigation between the parties.  What the Baeks are alleged to have done here is not in any sense unconnected with the litigation between Mr. Halvorson and his family and the Baeks.

The Baeks contend, however, that the direct relationship test requires that the alleged bad acts of the plaintiff forming the basis for unclean hands "must be <u>directly related to the claims for relief to which the defense</u> is addressed."[76]  Again, the Court would answer that such conduct <u>is</u> directly related because it arose during the course of the litigation of such claims.

What the Baeks seem to be arguing is that if wrongful conduct against a defendant occurs <u>after</u> a case commences, then such conduct by a plaintiff, no matter how egregious or aggravated, can <u>never</u> warrant application of the unclean hands doctrine because it does not, as the Baeks interpret it, relate to events giving rise to the plaintiff's original cause of action against the defendant.[77]

---

[75]  2 POMEROY'S EQUITY JURISPRUDENCE § 399 (5th ed. 1941).

[76]  Plaintiffs' Motion in Limine, Docket No. 196 in the 1391 Action, filed September 25, 2017 at page 9 of 28, lines 22-23 [underscoring in the original].

[77]  *Id.* at page 10 of 28, lines 13-16:  "That conduct occurred after Halvorson filed for bankruptcy and after the adversary proceedings were initiated.  The conduct at issue here has absolutely nothing to do with the bases for, or the merits of, the Baek Parties' affirmative claims asserted in the adversary complaints."

The Baeks' efforts to cabin and restrict the unclean hands doctrine in this fashion fail for two reasons.  The first is that case law precedent rejects the Baeks' interpretation of the doctrine.  The second is that the Baeks' narrow interpretation of the doctrine runs counter to centuries of equity jurisprudence and to the very hallmark of equity itself, which is its flexibility and its ability to adapt to new situations as they arise and as the interests of justice may require.

a.  *Judicial interpretation of the Direct Relationship Test.*

Bad acts by a plaintiff occurring after the filing of the complaint and during the litigation can be taken into account in determining whether equity's unclean hands doctrine applies and bars the plaintiff from obtaining any relief at all in the case.  It is well settled that one who comes into equity must come with clean hands <u>and keep those hands clean throughout the litigation</u>.[78]  The landmark case so holding would appear to be *Hall v. Wright,* 240 F.2d 787 (9th Cir. 1957), where the United States Court of Appeals for the Ninth Circuit affirmed a district court decision finding unclean hands on the part of both the plaintiffs and the defendants based upon actions those parties had taken "[b]efore and during the pendency of this litigation."  240 F.2d at 795.  The United States Court of Appeals for the Third Circuit followed the lead of the Ninth Circuit on this issue in *Gaudiosi v. Mellon,* 269 F.2d 873 (3d Cir.), *cert. denied,* 361 U.S. 902, 80 S. Ct. 211, 4 L. Ed. 2d 157 (1959).  In that case, Messrs. Phillips, Gaudiosi and Schwartz filed a complaint on April 9, 1958 against the Pennsylvania Railroad Company (the "Railroad"), seeking a declaratory judgment invalidating all proxies received by the Railroad and other forms of relief.  Twenty-one days after the filing of this complaint, on April 30, 1958, Phillips sent a threatening letter to two Swiss banks acting as

---

[78]  *See United States v. Howell,* 425 F.3d 971, 974 (11th Cir. 2005) ("[N]o principle is better settled than the maxim that he who comes into equity must come with 'clean hands' and keep them clean throughout the course of the litigation, and that if he violates this rule, he must be denied all relief whatever may have been the merits of his claim"); *Rorrer v. Cleveland Steel Container Corp.,* No. 08-0671, 2010 U.S. Dist. LEXIS 99697 (E.D. Pa. 2010); *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.,* 398 F. Supp. 2d 305, 311 (D. Del. 2005) ("Alternatively, if unclean hands occurs during litigation, it bars any recovery by the offending party"); *Goldstein v. Lincoln Nat'l Convertible Secs. Fund, Inc.,* 140 F. Supp. 2d 424, 441 (E.D. Pa. 2001); *Major v. Orthopedic Equipment Co.,* 496 F. Supp. 604, 609 (E.D. Va. 1980) ("From this premise one deduces the corollary that the plaintiff's hands must remain clean throughout the litigation if he is to continue to receive the protection or benefit of equitable relief.")

nominee for holders of a large number of Railroad shares.  This letter was sent in violation of

SEC rules and threatened legal actions unless the banks complied with Phillips's requests.

The Third Circuit affirmed the district court's determination that such actions by Phillips

constituted unclean hands and barred him from any relief.[79]  The Third Circuit was quite

explicit that not only must a plaintiff come into court with clean hands, the plaintiff must also

keep those hands clean during the litigation:

> These principles are well-settled:  One who comes into equity must come with clean hands **and keep those hands clean throughout the pendency of the litigation even to the time of ultimate disposition by an appellate court.**  Courts are concerned primarily with their own integrity in the application of the clean hands maxim and even though not raised by the parties the court of its own motion apply it.  The clean hands maxim gives wide sweep to the equity court's exercise of discretion 'in refusing to aid the unclean litigant'. [80]  [bold-faced type added by this Court].

This approach makes eminent sense.  A trial court explained the underlying logic as follows:

> . . . [I]t would be strange if a court of equity had power – because of public policy for its own protection – to throw out a case because it *entered* with unclean hands and yet would have no power to act if the unconscionable conduct occurred while the case was in court.  It would be as fantastic as to think that a householder could eject one who entered his house to steal the family silverware but could not eject a guest who had entered innocently but whom he later caught stealing the silverware.  Certainly there is no respectable legal authority for such an absurdity. [italics in the original].

*American Ins. Co. v. Lucas,* 38 F. Supp. 896, 921 (W. D. Mo. 1940), *aff'd sub. nom.,*

*American Ins. Co. v. Scheufler,* 129 F.2d 143 (8th Cir. 1942).

    Additional support for the proposition that equity's unclean hands doctrine applies with

equal force to a litigant who fails to keep his hands clean during the pendency of litigation can

---

[79]  A second action by plaintiffs was filed on May 9, 1958 after the district court dismissed the first action on May 6, 1958.  The unclean hands finding was made by the district court with respect to the second action, which was also later dismissed.  The Third Circuit heard an appeal with respect to both dismissed cases and expressly determined that unclean hands barred relief in the first action as well as the second:  "The bar of 'unclean hands' extends to plaintiffs' first action although it was not there considered in the District Court's disposition of it, and was not raised by defendants."  269 F.2d at 881.

[80]  269 F.2d at 881.

be found in *Mas v. Coca-Cola Co.*, 163 F.2d 505, 508 (4th Cir. 1947)[81] and *Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*, 792 F. Supp. 969, 972 (S.D.N.Y. 1992).[82]

>    b. *Equity's Historic Flexibility and Its Capacity to Provide a Just Remedy Where the Law Is Unable to Do So.*

The Court has looked in vain for statutes and federal common law specifically addressing the duty of a party who has been ordered by a court into mediation to refrain from sabotaging the mediation. Finding no such statutes or federal common law, the Court is nonetheless most reluctant to reach the conclusion that a party ordered into mediation has no duty whatsoever to refrain from sabotaging the mediation and is free to do so. The Court therefore turns to equity to determine if equity provides any relief where mediation sabotage has occurred. In this regard it is noteworthy that bankruptcy courts are courts of equity, and their proceedings are inherently proceedings in equity. *Local Loan Co. v. Hunt,* 292 U.S. 234, 240, 54 S. Ct. 695, 697, 78 L. Ed. 1230, 1233 (1934).

The application of equity in the Anglo-American judicial system dates back centuries. Pollock and Maitland comment as follows:

> Of 'equity' as of a set of rules which can be put beside the rule of 'law,' or of courts whose proper function is the administration, not of law, but of equity, we shall hear nothing for a long time to come. We must however remember first, that a contrast between *aequitas* and *rigor juris* is already a part of what passes as philosophical jurisprudence, and secondly, that our king's court is according to very ancient tradition a court that can do whatever equity requires. Long ago this principle was asserted by the court of Frankish kings and, at all events since the Conquest [i.e., the Norman Conquest of England in 1066 A.D.], it has been bearing fruit in England. It means that the royal tribunal is not so strictly bound by rules that it can not defeat the devices of those who would use legal forms for the purposes of chicane; it means also that the justices are in some degree free to consider all the circumstances of those cases that

---

[81] Although most cases in which the clean hands doctrine has been applied are cases in which the cause of action itself has arisen out of or been the fruit of unconscionable conduct, we do not understand that it is a prerequisite to the application of the doctrine that the cause of action shall have so arisen. It is sufficient to bar relief that plaintiff has been guilty of unconscionable conduct directly related to the cause of action, such as the fabrication of testimony, subornation of perjury or other like attempt to perpetrate a fraud upon the court or take an unconscionable advantage of his adversary. It is said that to have relief from a court of equity plaintiff must not only come into court with clean hands, but must keep his hands clean." [footnote omitted] 163 F.2d at 508.

[82] "Berkshire's arguments notwithstanding, we are not here limited by a purported requirement that forces us to separate wrongdoing that occurs prior to the instigation of legal proceedings from that which occurs during legal proceedings." 792 F. Supp. at 972.

come before them and to adapt the means to the end.  In the days of Henry II. and Henry III. the king's court wields discretionary powers such as are not at the command of lowlier courts, and the use of these powers is an exhibition of 'equity.'  Often on the plea rolls we find it written that some order is made 'by the counsel of the court' (*de consilio curiae)*.  It is an order that could not be asked for as a matter of strict right; the *rigor juris* does not dictate it—would perhaps refuse it; but it is made in order that the substantial purposes of the law may be accomplished without 'circuity of action' [footnote, citing to Glanvill, omitted].  The need of a separate court of equity is not yet felt, for the king's court, which is not as yet hampered statutes or by accurately formulated 'case law,' can administer equity.[83]   [italics in the original].

As the centuries passed, the king's court (the *curia regis*) assigned the task of administering equity to courts that were already in existence, notably the Court of Chancery. The development of these courts of equity is best understood within the context of what was occurring in the courts of common law, notably the Court of Kings Bench and the Court of Common Pleas.  The common law courts mandated the use of "forms of action,"[84] and no litigant could obtain relief unless such litigant's lawsuit could in some fashion be fitted within one of the recognized forms of action.  Although Parliament enacted a statute during the reign of Edward I intended to make new writs and forms of action available to litigants, the common law courts interpreted the statute in such a restrictive manner that the legislation's purpose was defeated with the result that litigants could not obtain from the common law courts the type of relief they were seeking.[85]  These litigants who centuries earlier would have applied to the king's court for relief turned instead to the courts of equity.

Justice Story described the process as follows:

The chancellor therefore . . . was the most proper judge whether upon any petition so referred [i.e., by the king's court] such a writ could not be framed and issued by him as might furnish an adequate relief to the party; and if he found the common-law remedies deficient, he might proceed according to the extraordinary power committed to him by the reference. . . and from many cases brought before him in which that law would not afford a remedy, and thereby through necessity or compassion to extend a discretionary remedy."[86]

---

[83]  THE HISTORY OF ENGLISH LAW, F. Pollock and F. Maitland (2d ed., 1899) at 189-190.
[84]  *See generally* F.W. Maitland, THE FORMS OF ACTION AT COMMON LAW (Cambridge 1971).
[85]  1 POMEROY 'S EQUITY JURISPRUDENCE, *supra,* at §§ 24-27.
[86]  1 COMMENTARIES ON EQUITY JURISPRUDENCE AS ADMINISTERED IN ENGLAND AND AMERICA, J. Story (14th ed. 1918) at § 43.

1  The Court of Chancery began hearing bills in equity by the end of the reign of Edward

2  III (1327-1377).  During the reign of Richard II (1377-1399), the equity side of the Court of

3  Chancery was in full operation.[87]

4  Many of the judges in eleventh and twelfth century England were churchmen because

5  these were often the only people otherwise available and suitable who were literate.  The

6  custom of appointing churchmen to high places in the judiciary seems to have persisted far

7  longer in the courts of equity than it did in the courts of common law.  Some of the Lord

8  Chancellors in the late fifteenth century were the following:  John Alcock, Bishop of

9  Rochester (1475); Thomas Rotheram, Bishop of Lincoln (1475-1483); John Russell, Bishop

10  of Lincoln (1483-1485); Thomas Rotheram, Archbishop of York (1485); John Alcock, Bishop

11  of Worcester (1485-1486); John Morton, Archbishop of Canterbury (1486-1500).  It is

12  perhaps because of the ecclesiastical background of the Lord Chancellors that the Court of

13  Chancery became recognized as a "court of conscience."[88]

14  By the middle of the eighteenth century, as Blackstone shows, a bankruptcy case

15  could be commenced by filing a petition with the Lord Chancellor, whereupon commissioners

16  in bankruptcy (the analog of today's bankruptcy judges) would be appointed who would then

17  supervise the election of the assignee (the analog of today's chapter 7 trustee) and

18  administer the bankrupt's estate.[89]  Upon an affirmative vote of 80 percent or more of the

19  creditors by number and value and a certificate to that effect authenticated by the

20  commissioners, the Lord Chancellor could grant the debtor a discharge.[90]  Thus, bankruptcy

21  as an institution developed solely on the equity side, and not the common law side, of

22  English jurisprudence.

23

24  [87] *Id.* at §§ 44-45.
[88] *Cf. Deweese v Reinhard*, 165 U.S. 386, 390, 17 S. Ct. 340, 341, 41 L. Ed. 757, 758 (1897):  "The right,

25  whatever it may be and from what source derived, must be not only one not protected by legal title, but in and of
itself appealing to the conscience of a chancellor.  A court of equity acts only when and as conscience

26  commands, and if the conduct of the plaintiff be offensive to the dictates of natural justice, then, whatever may
be the rights he possess and whatever use he may make of them in a court of law, he will be held remediless in

27  a court of equity."
[89] 2 Blackstone's Commentaries on the Laws of England *480-81.

28  [90] *Id.* at *482-83.

1    Article III, Section 2, Clause 1 of the United States Constitution provides that the

2    judicial power shall extend to all cases in law and equity arising under the Constitution and the

3    laws of the United States.  Under 28 U.S.C. § 1334, the district courts have original

4    jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under

5    title 11.  28 U.S.C. § 151 provides that the bankruptcy judges in regular active service

6    constitute a unit of the district court.  28 U.S.C. § 157 permits a district court to refer any and

7    all cases under title 11 and any and all proceedings arising under title 11 or arising in or

8    related to a case under title 11 to be referred to the bankruptcy judges for the district.  Here,

9    such referral was made by General Order No. 13-05 of the United States District Court for the

10   Central District of California (the "District Court"), filed July 1, 2013.  In view of that referral,

11   this Court is empowered to hear and determine all cases under title 11 and all core

12   proceedings arising under title 11.  A district court's equity powers that constitute part of the

13   judicial power under Article III flow through to this Court by reason of the District Court's

14   General Order No. 13-05.  As the Supreme Court wrote decades ago, this Court's bankruptcy

15   proceedings are inherently proceedings in equity.[91]

16   The point of this long discussion of legal history is to show that for many centuries

17   equity has been providing relief to litigants where the relevant statutes and the common law

18   failed to do so, and that equity has always retained and reserved for itself a sufficient degree

19   of flexibility to achieve a just result in a given case.  Equity's powers in this regard have

20   persisted into the present era.  The Supreme Court of the United States has emphasized that

21   courts of equity, such as this Court, apply the maxim of unclean hands "not by way of

22   punishment for extraneous transgressions, but upon considerations that make for the

23   advancement of right and justice.  *They are not bound by formula or restrained by any*

24   *limitation that tends to trammel the free and just exercise of discretion.*"  *Keystone Driller Co.*

25   *v. General Excavator Co.*, *supra,* 290 U.S. at 245-246, 54 S. Ct. at 148 [italics added by this

---

[91] *See Local Loan Co. v. Hunt,* 292 U.S. 234, 240, 54 S. Ct. 695, 697, 78 L. Ed. 1230, 1233 (1934).  Substantial overlap may exist between this Court's inherent equity powers and its statutory empowerment to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

1    Court].  Time and time again the courts have emphasized that the unclean hands doctrine is

2    wide-ranging and unconfined.  *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,* 324

3    U.S. 806, 814-815, 65 S. Ct. 993, 997 (1945); *Norton Co. v. Carborundum Co.*, 530 F.2d 435,

4    442 (1st Cir. 1976); *Goldstein v. Delgratia Mining Corp.*, 176 F.R.D. 454, 458 (S.D. N.Y.

5    1997).

6        Yet, in the face of the Supreme Court's express admonition in *Keystone Driller Co.* that

7    courts of equity are not bound by formula or restrained by any limitation that tends to trammel

8    the free and just exercise of discretion, that is precisely what the Baeks are urging in their

9    argument:  that this Court apply a limitation to the unclean hands doctrine so that bad acts

10   occurring after the filing of a complaint or a bankruptcy petition can <u>never</u> be taken into

11   account by a court of equity.  Such an argument runs directly counter not only to the Supreme

12   Court's rule in *Keystone Driller Co.* and the other authorities cited above but also to hundreds

13   of years of equity jurisprudence both in the United States of America and England where it

14   was recognized that the very heart and soul of equity was to supply relief to litigants where

15   the statutes and the common law were unable to do so.  The Court rejects the Baeks'

16   argument on the nature of the direct relationship requirement of the unclean hands doctrine

17   because it is completely inconsistent with centuries of equity jurisprudence.

18       *C.  Application of Equity's Unclean Hands Doctrine.*

19       As discussed above, parties who come into a court of equity must come with clean

20   hands and keep those hands clean throughout the course of the litigation.  It is black-letter law

21   that a bankruptcy court is a court of equity.  *Young v. United States*, 535 U.S. 43, 50, 122 S.

22   Ct. 1036, 152 L. Ed. 2d 79 (2002); *Northbay Wellness Group v. Beyries*, 789 F.3d 956, 959

23   (9th Cir. 2015).  The unclean hands doctrine therefore applies here in its full measure.

24       The purpose of the unclean hands doctrine is not to protect the defendant – it is to

25   protect the court from becoming an aider and abettor of iniquity.[92]  Courts apply the doctrine

---

[92] *Karpenko v. Leendertz*, 619 F.3d 259, 267 (3d Cir. 2010) ("As we have explained previously, the equitable doctrine of unclean hands is not a matter of defense to the defendant.  Rather, in apply it[,] courts are concerned primarily with their own integrity, and with avoiding becoming the abettor of iniquity." Aldisert, J., dissenting, citing *Ne. Women's Ctr., Inc. v. McMonagle*, 868 F.2d 1342, 1354 (3d Cir. 1989).

primarily for their own protection and only secondarily as a matter of defense to the

defendant. *Hall v. Wright,* 240 F.2d 787, 795 (9th Cir. 1957) ("In applying the unclean hands

maxim, the court is 'concerned primarily with protecting its own integrity from improper action

by a party.'"); *Gaudiosi v. Mellon, supra,* 269 F.2d at 882; *United Cities Gas Co. v. Brock*

*Exploration Co.*, 995 F. Supp. 1284, 1296 (D. Kansas 1998) (unclean hands is a "concept

designed to protect the court from becoming a party to the transgressor's misconduct").  The

authorities are agreed that it is entirely proper for a court to raise the doctrine *sua sponte*.

*Saudi Basic Indus. Corp. v. ExxonMobil Corp*, 401 F. Supp. 2d 383, 392-393 (D.N.J. 2005).

Judge Learned Hand seems to have stated these rules best:

> The doctrine (of unclean hands) is confessedly derived from the unwillingness of
> a court, originally and still nominally one of conscience, to give its peculiar relief to
> a suitor who in the very controversy has so conducted himself as to shock the
> moral sensibilities of the judge.  It has nothing to do with the rights or liabilities of
> the parties; indeed the defendant who invokes it need not be damaged, and the
> court may even raise it sua sponte.

*Art Metal Works, Inc. v. Abraham & Straus, Inc.*, 70 F.2d 641, 646 (2d Cir. 1934) (Hand, J.,

dissenting).

The unclean hands doctrine should not be applied when to do so would frustrate a

substantial public interest.  *Northbay Wellness Group, Inc. v. Beyries*, *supra,* 789 F.3d at 960.

Conversely, it would seem that if applying the unclean hands doctrine <u>furthers and advances</u>

the public interest, this would be an additional reason for applying it.

Determining whether unclean hands precludes relief requires a balancing of the wrongdoing

of the plaintiff against that of the defendant, and "weigh[ing] the substance of the right

asserted by [the] plaintiff against the transgression which, it is contended, serves to foreclose

that right."  *Northbay Wellness Group, Inc. v. Beyries*, *supra,* 789 F.3d at 960.

### 1. *Wrongdoing of the Baeks.*

Mediation serves an important public interest in our society's administration of justice.

Mediation promotes, encourages and facilitates the consensual resolution of disputes which

otherwise would be subject to a nonconsensual resolution by a court.

Although parties entering into mediation pursuant to a court order would seem to have relatively few duties, certainly one of those duties is to refrain from taking action that is expected or reasonably could be expected to cause the collapse of the mediation prior to its conclusion in the ordinary course (i.e., action that this Court has referred to as sabotaging the mediation).  To phrase it differently, if a court orders parties into mediation, it is hardly a stretch to conclude that such parties incur an obligation to refrain from taking actions that ruin or reasonably could be expected to ruin the mediation.

The evidence here shows that as soon as the indictment of Mr. Halvorson was returned, the Baeks wanted Mr. Halvorson arrested.  They told that to Mr. Demer and even offered to pay for the cost of extraditing him from California to Oregon.  The evidence further shows that four days before the mediation, on May 23, 2016, Mr. Tolliver had a telephone conference with Mr. Demer during which he informed Mr. Demer that Mr. Halvorson was ordered to attend the May 27 mediation in the federal courthouse in Riverside, California.  He again stated that he wanted Mr. Halvorson arrested.  Significantly, Mr. Demer testified that had he not been informed by Mr. Tolliver he probably would not have made any effort to have Mr. Halvorson arrested at the mediation.

Thereafter, Mr. Tolliver assisted Mr. Demer in various ways to fulfill the objective of getting Mr. Halvorson arrested at the mediation.  He sent Mr. Halvorson's photo and identifying information to Mr. Demer, and he kept Mr. Demer informed with up-to-the-minute details of Mr. Halvorson's whereabouts while the mediation was actually in progress.

What is most striking is there is no evidence of any effort, even the slightest effort, by Mr. Tolliver to ask Mr. Demer to arrange the arrest in such a manner that the mediation would not be scuttled by the arrest.  It was obvious or reasonably should have been obvious to Mr. Tolliver that Mr. Halvorson's arrest was certain to end the mediation as to Mr. Halvorson – he hardly could have continued mediating from a jail cell.  It also was obvious or reasonably should have been obvious to Mr. Tolliver that Mr. Halvorson's arrest was highly likely to end the mediation as to Dan and Ms. Randall – after seeing his brother arrested and put in handcuffs, Dan could not have been expected to keep mediating as if nothing had happened.

There is testimony that Judge Jury was "flabbergasted" by the arrest; it is likely Dan was as well.

Also striking is the exultation shown by Mr. Tolliver and Mr. Demer following Mr. Halvorson's arrest.  The "high five-ing" emails referred to above show that both Mr. Tolliver and Mr. Demer were completely delighted by the way things turned, that it was a job well done:  "We appreciate your work on this.  Grace says thanks, and that she is really greatful [sic] for the way you've approached the whole thing."  Nothing in those exchange emails shows even the smallest hint of surprise by Mr. Tolliver that Mr. Halvorson was arrested or even the smallest bit of concern that the mediation had just been effectively destroyed and ruined.  The reason for this is obvious:  Mr. Tolliver didn't care one whit that the mediation was ruined.[93]  What was far more important to him was realizing upon the opportunity to humiliate and embarrass Mr. Halvorson in front of his family, his attorneys and the Trustee's attorneys.  True, neither he nor his clients experienced "the therapeutic effect of seeing the handcuffs go on," but they had reason to think that Mr. Halvorson would be spending the next four days in jail over the long Memorial Day weekend.

Mr. Tolliver contended at trial that he thought Mr. Demer was going to order a "reach out and touch"[94] rather than an arrest.  It may well be that during the evening prior to the mediation and up until around 11:00 am on the morning of the mediation Mr. Tolliver believed that his scheme to have Mr. Halvorson arrested at the mediation and humiliated and embarrassed in front of his family and attorneys was not going to succeed.  The total absence of any indication of surprise in the "high five-ing" emails indicates the arrest, when it did occur, came as no surprise to Mr. Tolliver.  The Court believes that Mr. Demer's email of 11:48 am and text message of 11:55 am to Mr. Tolliver let Mr. Tolliver know that Mr. Halvorson's arrest was in the works. In any event, the fact that at some point on May 26 and May 27 Mr. Tolliver

---

[93]  Mr. Tolliver continued to hold discussions with the Trustee's attorneys following Mr. Halvorson's arrest, but those discussions proved fruitless in large part because the parties having authority to conclude a settlement with the Trustee – Ms. Baek and Mr. Baek – had departed from the courthouse.

[94]  This is a reference to law enforcement informing Mr. Halvorson of the indictment and the warrant for his arrest and asking him to turn himself in. See Exhibit X, pages 250-251 (email from Mr. Demer to Mr. Tolliver on May 27, 2016 at 8:42 am).

1   became temporarily uncertain whether his scheme was going to succeed or fail in no way

2   relieves him from the responsibility of having sabotaged the mediation.

3        The Baeks contend that Mr. Tolliver had no authority to arrest Mr. Halvorson and

4   therefore cannot be charged with responsibility for causing the mediation's collapse.  Of

5   course, it is true that Mr. Tolliver is not a law enforcement officer or a prosecutor and lacked

6   the ultimate authority to make the arrest happen.  Nevertheless, full responsibility for the

7   mediation's collapse rests on Mr. Tolliver's shoulders because he well knew or reasonably

8   should have known that the course of action on which he embarked was virtually certain to

9   scuttle the mediation and because he never made even the slightest effort to forestall this

10  outcome.

11       Certainly, Mr. Tolliver could have cooperated and encouraged Mr. Demer to have Mr.

12  Halvorson arrested at some venue other than the mediation without violating any rule of

13  equity or shocking this Court's conscience.  But arresting Mr. Halvorson at some venue other

14  than the mediation would not have accomplished the Baeks' and Mr. Tolliver's overriding

15  objective of humiliating and embarrassing Mr. Halvorson in front of his brother, his attorneys,

16  the Trustee's attorneys and Judge Jury.  It would have lacked the panache and the one-

17  upsmanship they were seeking.  The Baeks were prepared to sacrifice the mediation for these

18  objectives; they succeeded in this regard.

19       The mediation's scuttling by Mr. Tolliver resulted in a waste of Judge Jury's time and

20  effort as well as the time and effort of the Trustee's attorneys, Mr. Halvorson's attorneys and

21  Ms. Randall's and Dan's attorneys as well as Mr. Halvorson and Dan.  Additionally there was,

22  as Mr. Golden (the Trustee's attorney) pointedly argued, substantial prejudice to the Trustee

23  as a result of the mediation collapse engineered by Mr. Tolliver:

24              And, as we pointed out, we went to the mediation.  And when you go to the
             mediation you make settlement proposals and you talk to a mediator about facts and
25           law.  And we don't [know] exactly what the mediator says in the other person's room
             or doesn't say in the room, but you're doing something in your litigation case that
26           you're giving something up, your Honor.  You're sharing data . . . If that mediation
             wasn't going to go forward, we wouldn't have shared that information.  We wouldn't
27           have made proposals like that.  We wouldn't have share data in a format and in a
28

manner that can't be unrung . . . And, certainly, had we known the outcome, it's very fair to say that we would not have gone down that path knowing that the mediation would have been terminated, given the global mediation concept, because of the arrest. . . And so as a result, it absolutely prejudiced our case.[95]

There is every reason to believe that the cases of Mr. Halvorson, Dan and Ms. Randall were prejudiced as well, for the very same reasons articulated by Mr. Golden.

It is very much in the public interest that people who attend mediations should feel safe in doing so and should not have to be frightened that the mediation will be used by an opponent as an opportunity to get them arrested, whether that person is an undocumented individual, a person who has one too many parking tickets or otherwise has not led a simon-pure life.

In short, the Baeks' conduct shocks the moral sensibilities of this Court because it (1) was undertaken for the express purpose and with the specific intention of humiliating and embarrassing Mr. Halvorson in front of his family, his attorneys and the Trustee's attorneys, (2) substantially prejudiced the cases in this Court of the Trustee, Mr. Halvorson, Ms. Randall and Dan, (3) adversely affects the public interest in encouraging mediation, and (4) fatally undermined the Mediation Order of this Court.  Subject to the balancing considerations discussed below, this is a clear case where "He that hath committed iniquity shall not have equity."[96]

### 2.  *Application of the Balancing Test as to the Trustee.*

The Baeks do not argue that the Trustee directly engaged in any bad acts relevant with respect to the balancing test.  Instead, they argue that the Trustee should be imputed with the bad acts of Mr. Halvorson (i.e., the forgery of the amended prenuptial agreement).  The Baeks cite the Court to no authority that a bankruptcy trustee is imputed with the debtor's bad acts for purposes of the unclean hands doctrine.

The Court rejects the argument.  The bad acts of the Baeks occurred postpetition, the Trustee's rights as against the Baeks in respect of such wrongful conduct arise postpetition

---

[95] 5 R.T. at 149-151 of 223.
[96] 2 POMEROY'S EQUITY JURISPRUDENCE § 397 (5th ed. 1941).

and, as pointed out above, seriously prejudiced the Trustee in this case with respect to her rights against the Baeks.  There is no basis under the Ninth Circuit's balancing test in *Northbay Wellness Group* for imputing to the Trustee acts of Mr. Halvorson that occurred before the Trustee was even appointed.

The Court must also weigh the substance of the right asserted by the Baeks – the right to a favorable declaratory judgment with respect to whether estate property is separate property or community property – against their transgression.  Because of the prejudice to the Trustee's case, described above, as well as the cost and expense to the Trustee of a wasted mediation and the egregious and offensive nature of the Baeks' conduct in scuttling the mediation, the Court determines this balance tilts in favor of the Trustee and against the Baeks.

### 3.  Application of the Balancing Test as to Ms. Randall and Dan.

The Baeks contend that Ms. Randall and Dan engaged in bad acts for purposes of the balancing test by participating in and executing a scheme to hinder, delay or defraud the Baeks in their capacity as creditors of Mr. Halvorson through a transfer of a deed of trust on the Stockton Property to Dan.  The complaint in the 1391 Action alleges that Ms. Randall and Dan conspired with Mr. Halvorson and aided and abetted him in fraudulently transferring a deed of trust on the Stockton Property in order to hinder, delay and defraud the Baeks.

Conspiracy and aiding and abetting can be proven up with evidence of text messages, emails, letter correspondence and written and oral admissions in which a party discloses a purpose for a transfer.  Such evidence is lacking here.  Specifically, there is no evidence that Mr. Halvorson joined in the transfer of an interest in the Stockton Property for the purpose of hindering, delaying or defrauding the Baeks as distinguished from making the transfer to protect his brother's ability to obtain repayment of loans made to him.  Although the interest in the Stockton Property was transferred very close in time to the domestication of the Oregon judgment, the necessity of quick action goes just as much to protection of Dan's loans as it does to any purported intent to hinder, delay or defraud the Baeks.

1    The evidence shows that the promissory note and deed of trust executed by Ms.

2   Randall and Mr. Halvorson in Dan's favor were given in good faith and for fair value.  Ms.

3   Randall and Mr. Halvorson owed money to Dan in excess of the stated principal amount of

4   the promissory note.  Such loans aggregated at least $134,000, and the promissory note was

5   for $125,000.  Certainly, whether they thought about it or not, the actions of Ms. Randall and

6   Mr. Halvorson had the result of preferring Dan as a creditor over the Baeks, but there is no

7   rule that a mere preference is automatically a fraudulent transfer.  *Pierce v. Bank of the West*

8   *(In re Britt)*, 369 B.R. 526, 530 (Bankr. D. Ariz. 2007).

9    The deed of trust was executed proximate in time to the Baeks domestication of the

10   Oregon Judgment in California, but that does not show intent by Dan to hinder, delay or

11   defraud the Baeks, only an intent to act as a wise creditor and gain an advantage over a

12   competing creditor.  It is likely that a well-advised and well-informed bank or other financial

13   institution standing in Dan's shoes would have done precisely the same thing that Dan did.

14   On this record the Court declines to find bad acts by Dan.

15    Ms. Randall gave testimony at her deposition (admitted at trial) to the effect that she

16   knew the Baeks were trying to collect on the Oregon Judgment and that something needed to

17   be done to protect her interest in the Stockton Property (namely, the execution of the note and

18   deed of trust in Dan's favor).[97]  However, her testimony is unclear as to <u>when</u> she knew this.

19   It is obvious from the testimony offered and admitted that she had at best a very tenuous

20   grasp of the legal maneuvering that was occurring, and the Court does not determine that she

21   knew these things contemporaneously with the transaction as opposed to first learning them

22   after everything had happened.  On this record the Court declines to find bad acts by Ms.

23   Randall.

24    In summary, there were bad acts by the Baeks but not by Ms. Randall and Dan.

25    The substance of the rights asserted by the Baeks in the 1391 Action relate to a

26   purported fraudulent transfer of an interest in the Stockton Property (i.e., a deed of trust in

27

28   [97] *See* text accompanying footnote 24.

favor of Dan).  The counts alleged in the 1391 Action where the Baeks remain real parties in

interest with respect to causes of action for conspiracy and aiding and abetting.  For the

reasons stated above, there are no grounds on this record for concluding that Dan or Ms.

Randall conspired with Mr. Halvorson or each other or aided and abetted him or each other in

connection with a fraudulent transfer.  The transgressions of the Baeks in ruining the

mediation far outweigh the substance of the rights they are asserting, because there appears

to be no substance whatsoever to those rights.

### 4. *Application of the Balancing Test as to Mr. Halvorson.*

The application of the balancing test as to Mr. Halvorson presents what is far and away

the most difficult question in this litigation.  By forging the amended prenuptial agreement and

proffering it as a true and valid document at his deposition Mr. Halvorson engaged in bad

conduct that was both civilly and criminally wrongful.  It was seriously wrongful – felonious, in

fact.  Our society runs itself largely on the basis of documents (whether electronic or in paper

form), and forgery wreaks havoc on this ordering of society.  Certainly, there is no basis for

minimizing the wrongful nature of his conduct for purposes of the balancing test.

The bad acts of Mr. Halvorson and the Baeks share certain features.  Neither act was

done on the spur of the moment.  Each of the acts involved a measure of advance planning

over a period of time, likely several weeks.  Each act inflicted damage on the judicial process,

and each act was injurious to the public interest.

Mr. Halvorson urges the Court to determine that the forgery is unrelated to the Baeks'

causes of action in the 1391 Action and the 1454 Action and therefore should not be taken

into account under the balancing test.  This argument may have some validity insofar as the

1391 Action is concerned (the fraudulent transfer allegations appear to be wholly

unconnected with the forgery), but not as to the 1454 Action, which seeks a judicial

determination as to the identity of separate and community property, the very same property

interests that Mr. Halvorson was seeking to affect through a forgery of a purported amended

prenuptial agreement.

1    However, there is one very critical difference between the bad acts of the Baeks and

2    the bad acts of Mr. Halvorson.  Mr. Halvorson has been and is being punished for those acts;

3    the Baeks, but for this proceeding, are not.

4    Mr. Halvorson has lost his real estate broker licenses, he has been criminally

5    prosecuted and convicted and he has been subject to years of costly and unrelenting litigation

6    by the Baeks.  (It is literally true that he has been bankrupted and ruined by such litigation).

7    He is now a felon, a man with a serious criminal record.  All his non-exempt assets will be

8    distributed by the Trustee to his creditors.  He faces punishment in the Oregon criminal justice

9    system for his felonious conduct.  He has seen his aged and infirm mother named as a

10   defendant and dragged by the Baeks into fraudulent transfer litigation.  He has had to respond

11   to the Baeks' "final show of mercy" settlement offer which, if accepted, would have left his

12   elderly and infirm mother homeless unless he was able to get Ms. Baek off the loan on the

13   Stockton Property.  In other words, even if the Court decides this case in Mr. Halvorson's

14   favor and finds unclean hands by the Baeks as to him after applying the balancing test, he will

15   still be incurring extremely serious adverse consequences as a result of his wrongful

16   behavior.

17   The Baeks, on the other hand, will be getting off scot-free in terms of sanctions

18   imposed by the judicial system if this portion of the bifurcated trial is decided in their favor.

19   The Court believes it is proper to take punishment for bad acts into account in applying

20   the balancing test.  As discussed above, the unclean hands doctrine is flexible, and a court of

21   equity is not bound by formula or restrained by any limitation that tends to trammel the free

22   and just exercise of discretion.  *Keystone Driller Co. v. General Excavator Co., supra,* 290

23   U.S. at 245-246.  When Mr. Halvorson's serious punishment and many adverse

24   consequences attributable to his forgery are taken into account and in a certain sense "put

25   paid" to his transgressions, at least in part, the balance of the transgressions tilts sharply

26   against the Baeks.

27   The Court must also weigh the substance of the right asserted by the Baeks "against

28   the transgression which, it is contended, serves to foreclose that right."  *Northbay Wellness*

1    *Group, Inc. v. Beyries, supra,* 789 F.3d at 960.  The main elements of the relief the Baeks

2    seek against Mr. Halvorson are a determination that the Oregon Judgment and any spousal

3    support awarded to Ms. Baek are excepted from discharge, a determination that certain

4    estate property is or is not separate or community property, a determination that the deed of

5    trust on the Stockton Property should be recovered for the estate's benefit and damages

6    awarded against Mr. Halvorson on conspiracy and aiding and abetting causes of action.  The

7    Court interprets this portion of the balancing test as prohibiting a court of equity from depriving

8    a plaintiff of weighty, important and valuable rights for trivial transgressions.

9       Here, however, the transgression in question – the pre-planned and considered

10   sabotage of a mediation ordered by this Court, along with the intentional humiliation of Mr.

11   Halvorson in front of his attorneys and family – is hardly trivial.  To the contrary, the acts of

12   Mr. Tolliver are such as to shock the conscience of this Court and, if allowed to stand, would

13   undermine public confidence in mediation and therefore seriously implicate both public and

14   private interests.  The Court determines that the serious nature of the transgression by the

15   Baeks through their attorney outweighs the substance of the rights they are asserting in these

16   adversary proceedings.

17       For these reasons, the balancing test weighs in Mr. Halvorson's favor, leading the

18   Court to determine that the Baeks are guilty of unclean hands as to Mr. Halvorson.

19       *D. Remedies.*

20       The threshold issue with respect to remedies is whether the Baeks' unclean hands can

21   be quarantined within these two adversary proceedings – the 1391 Action and the 1454

22   Action – or whether they infect and contaminate the entire bankruptcy case.  This issue has

23   not been briefed or argued, and in view of that fact the Court declines at this point in time on

24   jurisprudential grounds to grant remedies extending beyond the 1391 Action and the 1454

25   Action.  The extension of remedies beyond these two adversary proceedings remains

26   undecided, and all parties' rights are reserved with respect to that issue.

27       *Keystone Driller Co. v. General Excavator Co., supra,* teaches that if a court of equity

28   determines that if a plaintiff is determined to be guilty of unclean hands, the court "will refuse

to interfere on his behalf, to acknowledge his right or to award him any remedy."  Applying the

teaching of *Keystone Driller*, this Court now determines as follows:

   *1.  Remedies as to the Trustee.*

All of Ms. Baek's claims for relief against the Trustee in the 1454 Action are dismissed

with prejudice.

   *2.  Remedies as to Ms. Randall and Dan.*

The seventh and eighth causes of action in the 1391 Action (relating to allegations of

conspiracy and aiding and abetting) are dismissed with prejudice as to Ms. Randall and Dan.

   *3.  Remedies as to Mr. Halvorson.*

The seventh and eighth causes of action in the 1391 Action (relating to allegations of

conspiracy and aiding and abetting) are dismissed with prejudice as to Mr. Halvorson.

Because PCC Fund 1, LLC, Granite Bay Partners II, LLC, JH RE Holdings, LLC and

Commercial Income Advisors, Inc. are alleged to be Mr. Halvorson's alter ego shell

companies, the seventh and eighth causes of action are dismissed with prejudice as to them

as well.

All of Ms. Baek's claims for relief against Mr. Halvorson in the 1454 Action are

dismissed with prejudice.  Mr. Halvorson's counterclaims against Ms. Baek in the 1454 Action

remain intact and are not dismissed.

**IT IS SO ORDERED.**

                              ###

Date: February 14, 2018

Mark S. Wallace
United States Bankruptcy Judge